1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

9   Vigilant Insurance,                    )    No. CIV-02-0452-PHX-MHM
                                           )
10              Plaintiff,                 )    **ORDER**
                                           )
11  vs.                                    )
                                           )
12                                         )
    Sunbeam Corporation,                   )
13                                         )
                Defendant.                 )
14                                         )
    _____   )

15
16      Currently before this Court are Plaintiff Vigilant Insurance Company's Motion to

17  Alter Judgment, (Dkt #229); Defendant Sunbeam Corporation's Motion for New Trial or

    alternatively a Remittur, (Dkt #236); and Defendant Sunbeam Corporation's Renewed
18
    Motion for Judgment as a Matter of Law, (Dkt. #246).  Having reviewed the motions and
19
    having heard oral argument on October 17, 2005, the Court enters the following order.
20
    **I.      Factual and Procedural Background**
21
        Plaintiff Vigilant Insurance provided fire and property insurance coverage to Tevhit
22
    and Ishik Camoglu during the year 2001. Am. Compl. (Dkt. #70) ¶3.  The Camoglus owned
23
    an 8,000 square foot custom home on Happy Valley Road in Scottsdale, Arizona, which was
24
    covered under the policy.  Id. at ¶1. On February 15, 2001, a fire broke out in the Camoglu
25
    kitchen in the vicinity of the Mr. Coffee brand coffee maker and caused fire, smoke, and
26
    water damage to the residence and to the Camoglus' furnishings and personal property. On
27
    February 23, 2001, a claims representative for Plaintiff notified Defendant Sunbeam
28

1   Corporation that it planned to seek subrogation of the damages from Sunbeam on the basis

2   that its' Mr. Coffee brand coffee maker was the cause of the fire.

3        Vigilant Insurance paid the Camoglus  in excess of $2.3 million for damage to real

4   and personal property and living expenses, including $895,000 for damage to contents of the

5   residence.  Am. Compl.¶14. In this lawsuit, Vigilant Insurance sought recovery of these

6   sums from Defendant Sunbeam Corporation, on theories of negligence, strict liability, and

7   breach of implied warranty of merchantability.  See id.

8        A jury trial was held from March 2, 2005 to March 17, 2005. During the trial, Plaintiff

9   presented testimony from Captain Mark Zimmerman regarding his observations of the

10  Camoglu residence.  Tr. 3/02/05, 3/03/05. Jeffrey Lindsey, P.E., C.F.I. testified as an expert

11  that he believed a design or manufacturing defect in the Mr. Coffee coffee maker caused the

12  fire. Tr. 3/04/05, 3/07/05.  Specifically, Mr. Lindsey testified either a defect in the electrical

13  wiring or the circuit board was the ignition source.  Id. Lester Hendrickson testified as an

14  expert and opined due to burn patterns and his evaluation of the circuit board the Mr. Coffee

15  was the source of the fire.  Tr. 3/04/05.

16       On March 22, 2005, the jury returned a verdict in favor of Plaintiff Vigilant Insurance

17  and against Defendant Sunbeam.  The jury found: Defendant Sunbeam liable to Plaintiff for

18  strict product liability, without any damages on Count 1; Defendant Sunbeam not liable to

19  Plaintiff Vigilant Insurance for negligence on Count 2; and Defendant Sunbeam liable to

20  Plaintiff for breach of the implied warranty of merchantability on Count 3, assessing

21  damages for the reasonable value of necessary repairs in the sum of $1,310,725, the

22  reasonable value of personal property in the sum of $895,833, and the reasonable value of

23  additional living expenses in the sum of $121,960. Dkt. #191.

24  **II.    Renewed Motion for Judgment as a Matter of Law**

25        **A.    Legal Standard**

26  FED R. CIV. PRO Rule 50(b) provides in pertinent part that:

27            If during a trial by jury a party has been fully heard on an issue
            and there is no legally sufficient evidentiary basis for a
28            reasonable jury to find for that party on that issue, the court may

1  determine the issue against that party and may grant a motion
2  for judgment as a matter of law against that party with respect
   to a claim....

3  FED. R. CIV. PRO. 50(a)(1) (2005).

4      Under Rule 50(b), a party may renew its motion for a judgment as a matter of law

5  within ten days after entry of final judgment. Id. at 50(b).  "Judgment as a matter of law is

6  proper if the evidence, construed in the light most favorable to the non-moving party, allows

7  only one reasonable conclusion . . ." Acosta v. City and County of San Francisco, 83 F.3d

8  1143, 1145 (9th Cir.1996). "If reasonable minds could differ as to the import of the evidence,

9  however, a verdict should not be directed." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

10 250-51 (1986).  The standard for granting a renewed motion for judgment as a matter of law,

11 pursuant to Rule 50(b) of the Federal Rules of Civil Procedure mirrors  standard for granting

12 a motion for summary judgment.  Id.

13     Defendant moved for judgment as a matter of law at the end of Plaintiff's case, but the

14 Court denied the motion, and Defendant failed to renew the motion at the close of all

15 evidence. The Ninth Circuit has held failure to comply with Rule 50(b) precludes a challenge

16 to the sufficiency of the evidence.   Farley Transportation Co., Inc. v. Santa Fe Trail

17 Transportation Co., 786 F.2d 1342, 1345-47 (9th Cir.1985).  "[T]he requirement that the

18 motion be made at the close of all the evidence is to be strictly observed." Id.

19     Defendant concedes it did not move for a renewed motion for judgment as a matter of

20 law at the close of all evidence but instead argues two exceptions apply:  where there is

21 no new evidence presented after the motion is made, or alternatively, "where there is plain

22 error apparent on the face of the record that, if not noticed, would result in a manifest

23 miscarriage of justice." Patel v. Penman, 103 F.3d 868, 878 (9th Cir. 1996).

24     However, the Ninth Circuit has not adopted the first exception.  See Id. (noting the

25 court need not consider whether an exception to renewing a 50(b) motion exists where there

26 is no new evidence presented after the motion is made because it did not apply to the case

27 and commenting "[t]he only authority cited for this proposition is a 1989 District of Nebraska

28 decision.") Furthermore, Defendant presented expert testimony related to its theory the fire

1   was not caused by a design and manufacturing defect in the Mr. Coffee and, in fact, noted

2   in its motion Plaintiff did not rebut Dr. Cheng's testimony.  Therefore, even if the exception

3   existed in the Ninth Circuit, it is inapplicable to the portion of the motion seeking judgment

4   as a matter of law in regards to a design or manufacturing defect.  Accordingly, applying the

5   "plain error" exception, the Court will conduct an "extraordinarily deferential review that is

6   limited to whether there was *any* evidence to support the jury's verdict, irrespective of its

7   sufficiency."Id.

8        **B.    Discussion**

9        Defendant raises three grounds in support of its motion: (1) Vigilant's contents expert,

10  Larry Olson,  failed to testify as to the contents' fair market value; (2) Mr. Olson's testimony

11  was inherently unreliable because Mr. Olson misrepresented his valuation was based on a

12  sampling method, when in fact Mr. Olson never personally sampled the contents; and (3)

13  there was insufficient evidence to establish the coffee maker had an internal defect because

14  Dr. Cheng refuted the basis for Mr. Lindsey's testimony.

15             **1.    Evidence Supporting Contents Damages**

16       Defendant's arguments in relation to Mr. Olson and the contents damages intertwine

17  the admissibility of expert testimony with a sufficiency of the evidence argument.   In

18  essence, Defendant appears to argue, Mr. Olson's testimony was unsupported by sufficient

19  facts or data and/or sufficient methodology, and therefore, the testimony was improper under

20  Daubert and was insufficient to support the jury's verdict.

21       Expert testimony is admissible if (1) the testimony is based upon sufficient facts or

22  data, (2) the testimony is the product of reliable principles and methods, and (3) the witness

23  has applied the principles and method reliably to the facts of the case. FED. R. EVID. Rule 702

24  (2005).  Rule 702 requires the Court to ensure that any and all expert testimony, including

25  scientific, nonscientific, and specialized testimony, is not only relevant, but reliable.  Daubert

26  v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  Therefore the court must find

27  a " valid ... connection to the pertinent inquiry . . . and a reliable basis in the knowledge and

28  experience of [the relevant] discipline." Id. at 592.

In relation to Mr. Olson, Defendant attacks both the reliability of the underlying evidence Mr. Olson based his opinion on and his methodology.  Essentially, Defendant contends that Mr. Olson never viewed the damaged items, never viewed photographs of the damaged items, never received any written verification of the original receipts or replacement receipts, received appraisals for only 3 items in determining the value of the contents, and based his entire valuation on Mr. & Mrs. Camoglu's representation of losses.

In this case, there was testimony David Soloman, a Vigilant Insurance staff adjuster, was initially assigned to the Camoglu fire.  Tr. 3/3/05, p. 190.   Mr. Soloman handled the claim for the first six weeks and sorted through the Camoglu's personal property, which was destroyed in the fire.  Id.  Mr. Olson testified he relied upon Mr. Soloman in handling the Camoglu claim.  Id. at p. 192.  Mr. Olson viewed photographs of fire, smoke and water damage to different areas of the Camaglou home, where the contents were located.  Tr. 3/1/05, pp. 103-104.  Mr. Olson based his valuation on the sampling method, which involves discerning the value of a sample of damaged items and attributing the damage to all items.  Tr. 3/1/05, p. 105.  Mr. Olson testified the sampling method is accepted in the industry for determining losses in a fire.  Id.  Although Mr. Olson conceded he neither himself viewed the contents nor pictures of the contents, he relied on Mr. Soloman's findings, "some receipts for replacement of certain items," and interviews with the Camoglus. Tr. 3/1/05, p. 125.  The Court found at the Daubert hearing, Mr. Olson's testimony was based on sufficient reliable evidence due to Mr. Olson's testimony and the practicalities of replacing contents of a home.  As Mr. Olson testified "it's not practical to ask an insured to provide receipts for every item."  Based on the foregoing, the Court finds that Mr. Olson's testimony was based on sufficient facts under Daubert and supports the jury's verdict.

Additionally, Defendant argues that Mr. Olson's methodology is unreliable because Mr. Olson did not examine the contents to determine age and condition, did not consult outside sources to determine depreciation rates, and instead applied a 30% depreciation rate based on the condition reported by Mrs. Camoglu.  Here, Mr. Olson testified he arrived at a fair market value, "[t]hrough appraisal, through discussions with Mrs. Camoglu, through

1    input from her consultant, Ed Montano, through [Mr. Olson's] general knowledge in working

2    on large, complex property and contents claims. . ." Tr. 3/1/05, p. 106.  Mr. Olson also

3    testified he interviewed Mrs. Camoglu about her lifestyle, and based on her representations

4    depreciated many clothing and shoes 30-40% because she "didn't keep clothes around that

5    were worn out and had holes in them." Tr. 3/1/05, p. 107.  Mr. Olson depreciated the antique

6    furniture at a zero depreciation rate.  Id. at 108.  After applying these depreciation rates and

7    negotiating an amount, Mr. Olson arrived at a "fair market value." Id. at 112.

8         Based on the testimony presented, valuing personal property damages from a fire is

9    not a precise method, and instead, an industry accepted practice is valuing the claim on a

10   'sample' representation of the losses and then 'negotiating' the losses with the insured.  Under

11   a Daubert analysis, Mr.Olson's testimony is based on a reliable methodology, because Mr.

12   Olson applied various depreciation rates depending on the type of property and based these

13   on the manufacturer, brand, condition, age of the personal property, as well as appraisals,

14   input from the Camoglus, and general knowledge of claims

15        Finally, the Court finds the cases relied on by Defendant inapposite.  In Saia v. Sears

16   Roebuch and Co. Inc., 47 F. Supp. 2d 141, 148-149 (D. Mass. 1999), the Court rejected

17   under Daubert proffered expert testimony on hedonic damages, reasoning the damages were

18   not testable, failed to accurately reflect the value of human life, and would not be helpful to

19   the jury.  In Santalucia v. Sebright Transp., Inc.,184 F. Supp. 2d 224, 226 (N.D.N.Y. 2002)

20   the Court struck the proffered expert testimony of an insurance adjuster on valuing a claim

21   for wrongful death of the mother because the expert had never adjusted a case originating in

22   Nevada, did not survey statistics to compare the size of Nevada jury verdicts or settlements,

23   relied upon personal experience in New York and Vermont, and failed to consider any

24   support from the infant's father.

25        As noted above, due to the nature of a fire, it is impossible to verify that the Camoglu's

26   owned every item they asserted, when that item was purchased, or the exact model or brand.

27   Mr. Olson based his valuation on interviewing Mr. & Mrs. Camoglu, viewing their home,

28   and knowledge of the kind and quality of their belongings.  Simply, the industry standard is

1  not a precise science and involves the value of a sample reduced by negotiation. The fact that

2  Mr. Olson may or may not of consulted independent sources as to the fair market value,

3  relied on Camoglus representations, which may or may not have been credible, goes to the

4  weight of his testimony rather than its admissibility.   "Vigorous cross-examination,

5  presentation of contrary evidence, and careful instruction on the burden of proof are the

6  traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509

7  U.S. at 596.   Accordingly, the Court finds Mr. Olson's testimony was based on sufficient

8  facts and data and a reliable methodology, and therefore, the jury verdict was based on

9  sufficient evidence.

10                     **2.        Evidence of a Design or Manufacturing Defect**

11         Defendant argues the verdict was against the weight of the evidence because

12  Defendant's experts disagreed with Plaintiff's experts and/or Plaintiff's expert's "testimony

13  was proved false" by Defendant's expert's testimony.

14         A judgment as a matter of law is not appropriate because there was a legally sufficient

15  evidentiary basis for a reasonable jury to find for the Plaintiff.  Even under a traditional Rule

16  50(b) standard, expert  disagreement as to the cause of the fire and the underlying facts  is

17  not a basis for judgment as a matter of law.  Where causation is disputed and Plaintiff has

18  provided "detailed, non-conclusory expert depositions and other submissions" refuting

19  defendant's theory, summary judgment is not appropriate. Speller v. Sears, Roebuck & Co.,

20  790 N.E.2d 252, 255 (2003) (concluding that the issue of what caused a fire was for a jury

21  to decide, where each side's experts had competently interpreted burn patterns differently).

22         Furthermore, Plaintiff introduced testimony and evidence from Mr. Hendrickson, Mr.

23  Lindsey, and Mr. Sesniak that in their respective expert opinions the cause of the fire to a

24  reasonable degree of scientific certainty was the Mr. Coffee coffee maker.  Their opinions

25  were supported by their theory of incipient grain boundary melting, electrical arcing, and

26  ruling out all other potential ignition sources.  Based on this theory these experts concluded,

27  either a design or manufacturing defect in the Mr. Coffee coffee maker caused the fire at the

28  Camoglu residence.  Therefore, based on the testimony and exhibits admitted into evidence

a judgment as a matter of law is not appropriate because there was a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff.

**III.    Motion for a New Trial**

    **A.    Legal Standard**

Under Rule 59(a), this Court may grant a motion for a new trial if the verdict was against the weight of the evidence, there is newly discovered evidence, or there was improper conduct by counsel or the Court.  See Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 540 (1958) (trial court has discretion to grant a new trial where verdict is against the weight of the evidence); Defendants of Wildlife v. Bernal, 204 F.3d 920, 928-29 (9th Cir. 2000) (stating test for new trial on basis of newly-discovered evidence); Wharf v. Burlington N. R.R. Co., 60 F.3d 631, 637 (9th Cir. 1995) (stating test for granting new trial in face of improper conduct by counsel).   The court should uphold a jury's award of damages unless that award is based on speculation or guesswork. See City of Vernon v. S. Cal. Edison Co., 955 F.2d 1361, 1371 (9th Cir.1992).

A new trial is warranted on the ground of attorney misconduct during the trial where the "flavor of misconduct ... sufficiently permeate[s] an entire proceeding to provide conviction that the jury was influenced by passion and prejudice in reaching its verdict." Kehr v. Smith Barney, Harris Upham & Co., 736 F.2d 1283, 1286 (9th Cir.1984) (citations omitted). If the misconduct permeates the proceeding, the jury is "necessarily prejudiced." Id. at 1286.  This Court is in "a superior position to gauge the prejudicial impact of counsel's conduct during the trial." Id.

    **B.    Discussion**

Defendant argues attorney misconduct, insufficient evidence, and erroneous evidentiary ruling are basis for a new trial.

        **1.    Allegations of Misconduct**

Defendant alleges three grounds of attorney misconduct support a new trial, (1)Plaintiff's counsel's publication of a criminal statute, implying Defendant's expert Mr.

McGinley committed a felony when investigating the fire; (2) improper testimony regarding Sunbeam's documents; (3) and spoilation of evidence.[1]

### a.    Publication of Criminal Statute

During cross-examination of Defendant's fire expert, Mr. McGinley, and after the Court directed Plaintiff's counsel to disclose any surprise issues at sidebar before mentioning them in the presence of the jury, Plaintiff's counsel published a statute providing licensing requirements for anyone acting as a "private investigator" and provides failure to obtain a license before investigating a fire constitutes a felony.  A "private investigator" is defined as a person who investigates "[t]he causes and origin of, or responsibility for, a fire . . ." ARIZ. REV. STAT. §32-2401 16(a)(vi).

The Court was troubled by Plaintiff's counsel's conduct in publishing the statute. While Plaintiff's counsel argues he sought permission, the argument is disingenuous at best. Mr. Asperger requested to publish a statute, without alerting the Court it was a criminal statute and would imply Defendant's expert committed a felony when investigating the fire.

However, the Court finds the minimal questioning and time the jury reviewed the statute in addition to the limiting instruction cured any prejudice. During cross-examination, the Court permitted the statute to be published, and the following questioning ensued:

> Q. Mr. McGinley, you didn't bother to check to see whether you could legally investigate this fire or sit in this courtroom and testify to this jury, did you?
>
> A. I've never read that Arizona law, if that's what you're asking, sir, I have not.
>
> Q. Had you read it, you would have recognized that you are engaging, as you sit here today, and as you did in 2001—.

Tr. 3/10/05, p. 1013.  Immediately thereafter, Defendant objected and a discussion took pace at sidebar.  The Court then instructed the jury to disregard the line of questioning related to licensing and that it had been stricken.  Based on the limiting instruction, minimal

---

[1]Defense counsel urged its spoilation of evidence issue in its renewed motion for a judgment as a matter of law.  However, as the argument seeks reconsideration of a March 2004 summary judgment order, it is more properly interpreted as a motion for a new trial.

1    questioning, and small amount of time the jury reviewed the statute, the Court concludes

2    there was insufficient prejudice to warrant a new trial.  Greer v. Miller, 483 U.S. 756, 766

3    n. 8 (1987) (concluding jury is presumed to follow instructions to disregard inadmissible

4    evidence unless there is overwhelming probability that the jury is unable to do so).

### b.   Testimony Regarding Sunbeam's Documents

6        Next, Defendant argues Plaintiff's counsel misled the Court and defense counsel

7    regarding his understanding whether discovery was completed and that Plaintiff's counsels

8    misrepresentations regarding the existence, importance, and availability of these documents

9    led the Court to permit Mr. Lindsey's testimony that these type of documents typically exist.

10        After reviewing the record, the Court finds the allegations of misconduct and the

11   asserted basis for the Court's permitting testimony regarding Sunbeam's documents is not

12   supported by the record.  The history regarding the production of the design schematics and

13   warranty records is lengthy and convoluted, at best. Shortly before trial, Plaintiff again

14   argued Defendant had yet to produce all of the necessary design schematics and warranty

15   records. Dkt. #141.  The issue of Sunbeam's records was relevant, in pertinent part, to Mr.

16   Lindsey's analysis of an alleged design defect in the Mr. Coffee coffee maker.  The Court

17   ultimately concluded both parties were culpable: Defendant was late producing discovery,

18   which may have been incomplete;  Plaintiff was not diligent in seeking discovery.

19        Ultimately, the Court permitted Mr. Lindsey to testify regarding the type of records

20   typically retained by manufacturers and that such records were not made available to him.

21   Tr. 3/04/05, pp. 423-430; Tr. 3/07/05, pp. 501- 506.  Although Defendant argues in its

22   current motions the Court permitted this testimony because Plaintiff's counsel made

23   misrepresentations regarding the documents, the Court allowed the testimony because

24   Plaintiff's expert testified in order to conduct a proper analysis of the coffee maker he

25   required design schematics and all warranty reports, not just one month's worth.  In addition,

26   the Court found both parties were culpable for the fact these schematics and records were

27   not produced. Furthermore, while the Court permitted testimony regarding why Mr. Lindsey

28   was not able to pinpoint a precise design defect, the Court limited Plaintiff's counsel from

drawing an inference the failure to produce these documents indicated Defendant was negligent or that the documents would have been adverse to Defendant. Tr. 3/16/05, pp. 1374-1375.

Based on the foregoing, the Court finds both parties were culpable for the fact these schematics and records were not produced. The Court permitted testimony as to why Mr. Lindsey was unable to point to a specific design defect but limited any adverse inferences, therefrom.  Accordingly, the Court finds the allegations of misconduct causing confusion and an erroneous evidentiary ruling, are not supported by the record.

### c.    Spoilation of Evidence

In its renewed motion for a judgment as a matter of law, Defendant reurged the issue of spoilation of evidence and argues the adverse inference instruction was an insufficient sanction.  In an Order dated March 31, 2004, the Court granted in part and denied in part Defendant's motion for summary judgement regarding exclusion of Plaintiff's contents claim based on spoilage of evidence.   The Court concluded that the drastic remedy of dismissing Plaintiff's contents claim was not warranted because the evidence failed to support any finding of bad faith or willfulness on the part of Plaintiff, and instead, the less drastic sanction of an adverse inference instruction was sufficient to sanction Plaintiff for its failure to preserve by videotape or photograph a record of the damaged contents.  See Dkt. #106, pp. 6-7.

Defendant argues that during trial there was evidence of additional prejudice to Defendant and bad faith conduct of Plaintiff warranting the Court to revisit its March 31, 2004 Order and dismiss Plaintiff's contents claim. The Court finds at a minimum Defendant was obligated to bring this issue to the Court's attention before submitting the evidence to the jury. Defendant has not briefed the appropriate standard of review to the Court's 2004 Order granting in part summary judgment a year before a jury trial, which was never reurged before entry of the verdict and judgment. Accordingly, the Court will review the spoilation issue for plain error under a 59(a) motion for a new trial.

Defendant argues it was additionally prejudiced because it was unable to effectively cross-examine Mr. Olson because neither Defendant nor Mr.Olson viewed and inspected the contents.  Additionally, Defendant argues: Plaintiff's counsel stated during oral argument on Defendant's motion for summary judgment due to spoilation that ServiceMaster and Carnation Cleaners "did the evaluation of lost items" but never produced that proof. Also, Defendant argues Plaintiff's counsel informed the Court, Bob Goldsmith offered Defendant "the opportunity to look at [the contents]" and Defendant did not take this opportunity. Defendant argues Plaintiff offered to produce Mr. Goldsmith at trial but never did so.

Additionally, Defendant asserts "new evidence" demonstrates Plaintiff acted in bad faith, including: Plaintiff's counsel maintaining Mr. Olson saw the contents; Ed Montano's testimony the contents were stored in a warehouse and available for months; Ed Montano's testimony many pictures were taken, but these were never produced; and Mrs. Camoglu gave Mr. Olson an opportunity to view the contents but he took Mrs. Camoglu at her word and told her to throw the contents away.

The Court finds that each of the above listed arguments demonstrating prejudice were previously contemplated by the Court when it found the appropriate remedy was an adverse inference instruction.  In its Order dated March 31, 2004, the Court found:

> It is undisputed that Plaintiff failed to preserve by photographs, videotape or appraisal the allegedly unsalvageable contents of the residence on which it paid $895,000, which amount it seeks to recover from Sunbeam in this lawsuit. . . It is also undisputed on the record before this Court that Plaintiff's adjustor paid the $895,000 to the Camoglus without having actually seen the damaged contents himself, simply on the basis of Mrs. Camoglu's estimate that these items were unsalvageable, and that they had a particular value.  It is also undisputed that Plaintiff failed to notify Defendant Sunbeam before it destroyed the actual items for which it paid a substantial content damages claim, or warned Defendant that it intended to destroy these items without preserving a photographic or videographic record of them.  Finally, it is undisputed that *Defendant Sunbeam's expert is prejudiced by being unable to quantify the fair market value of the contents loss because of the lack of documentation*.

When finding an adverse inference instruction appropriate, the Court contemplated Defendant was prejudiced by its inability to quantify the fair market value.  While Plaintiff

- 12 -

had the duty of showing damages, there has been no allegation Defendant was precluded from deposing ServiceMaster and/or Bob Goldsmith to establish Plaintiff's counsel misstated the facts. Furthermore, while Defendant's ability to cross-examine was prejudiced it was not altogether thwarted, Defendant deposed Mr. Montano, Vigilant's expert who personally viewed the contents and the Camoglus.

In reference to the proffered bad faith conduct, first Defendant asserts Plaintiff's counsel maintains Mr. Olson viewed some of the contents.  Defendant neither cites to a hearing nor provides a transcript.  Even still, Mr. Olson conceded during his testimony he did not view the contents. Tr. 3/3/05, p. 226, ln. 11-14.  That Plaintiff's counsel may have stated Mr. Olson viewed some of the contents when in fact he did not, does not establish sufficient prejudice to dismiss Plaintiff's contents claim

Secondly, the Court notes the statements of Mr. Montano date to Mr. Montano's deposition on August 10, 2004.  Thus, for over a year Defendant was on notice, and should have brought allegations, that Plaintiff maintained the contents for longer than alleged, destroyed them for the purposes of litigation, and failed to produce photographs.  In failing to do so, Defendant has waived this argument.  Nonetheless, during oral argument Plaintiff's counsel represented and Mr. Olson testified that the contents adjusting process went on for several months. Tr. 03/03/04, pp. 201-207.  Thus, the Court was aware that Plaintiff was in possession of the contents for some period of time.

The Court found Plaintiff was under a duty to preserve the contents and failed to do so.  However, Mr. Olson testified that many of the contents were damaged beyond repair and the remaining were disposed of because they would start to grow mold and pose a health hazard.  Tr.3/1/05, pp. 99-100.  Therefore, the Court finds the evidence presented fails to support any finding of bad faith or willfulness on the part of Plaintiff, and consequently, a new trial is not warranted. See Glover, 6 F.3d at 1329 (finding the careless conduct of experts did not warrant exclusion of evidence).

**2.**        **Weight of the Evidence**

Defendant argues the verdict was against the clear weight of the evidence because there was insufficient evidence to support a design or manufacturing defect.  Defendant's argument is based on its theory there was insufficient evidence the fire started internal to the coffee maker.  Specifically, Defendant asserts (1) due to Mr. Camoglu's unreliable testimony, the jury could not exclude the possibility of combustible material near the coffee maker; (2) Mr Hendrickson's theory intuitively makes little sense;[2] (3) Mr. Lindsey's theory regarding faulty wiring was contradicted by Dr. Cheng's testimony indicating those wires did not come from the coffee maker; and (4) Mr. Lindsey's opinion regarding the circuit board was illogical, contrary to the evidence, and disproved by Dr. Cheng.[3]

First, the reliability of Mr. Camoglu, Mr. Lindsey, and Dr. Cheng's  testimony was a question for the jury. Credibility determinations, weighing of the evidence, and inferences from facts are questions for a jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Secondly, as noted above, Plaintiff provided sufficient evidence to support the jury verdict.  See Speller ex re. Miller v. Sears, Roebuck and Co., 100 N.Y.2d 38, 41 (N.Y. 2002). In Speller, the plaintiffs brought a design and manufacturing defect product liability action, alleging faulty wiring in the upper right quadrant of a refrigerator was the cause of a fire. The part of the refrigerator the plaintiffs believed was the source was consumed in the fire. Defendant asserted a grease fire was the cause, which was also the conclusion of the fire marshal. Id. at 42.  Plaintiff offered three expert opinions, including an electrical engineer who opined he could only surmise the source of the fire because it had been consumed, but

---

[2]To the extent Defendant cites to Dr. Zaminski's burn test disproving Mr. Hendrickson's theories, the Court excluded the burn test as inadmissible and did not consider these arguments.  Furthermore, to the extent Defendant argues Mr. Hendrickson did not test his theories, the Court deems this argument waived because Defendant failed to move in limine (or at trial) to preclude Mr. Hendrickson's testimony as unreliable for failure to test or any other grounds.

[3]To the extent Defendant argues Mr. Lindsey did not test his theories, the Court below found that argument to be waived.

the "most logical probability" was wiring because the plastic components ignited easily and the doors of the refrigerator were "slightly bellied out," indicating they were blown out from the expanding hot gases. Plaintiff's remaining experts based their opinions, in large part, on what had and had not been consumed in the fire. Id. 42-43. After reviewing depositions and expert reports, the New York Court of Appeals concluded "plaintiffs raised a triable question of fact by offering competent evidence which, if credited by the jury, was sufficient to rebut defendants' alternative cause evidence. In other words, based on plaintiffs' proof, a reasonable jury could conclude that plaintiffs excluded all other causes of the fire." Id.

Similarly, in this case, Plaintiff introduced testimony and evidence from Dr. Hendrickson, Mr. Lindsey, and Mr. Sesniak that in their respective expert opinions the cause of the fire to a reasonable degree of scientific certainty was the Mr. Coffee coffee maker. Mr. Hendrickson testified he compared the damaged heating channel to an exemplar, which coincided to the location of the heating element and the consumed circuit board. Tr. 3/4/05, pp. 299. Mr. Hendrickson testified the channel melted at a different temperature then other portions of the coffee maker. Id. at pp. 298, 307. Mr. Lindsey testified that wires recovered from the fire and missing portions of the circuit board demonstrated the fire started internal to the coffee maker. Tr. 3/8/05, pp. 561-62. Both Mr. Lindsey and Mr. Hendrickson testified they had ruled out all other ignition sources and that in their opinion the fire started internal to the coffee maker. Tr. 3/4/05, p. 308; Tr. 3/8/05, pp. 563-564. Their opinions were supported by their theory of incipient grain boundary melting, electrical arcing, and ruling out all other potential ignition sources. Based on this theory these experts concluded, either a design or manufacturing defect in the Mr. Coffee coffee maker caused the fire at the Camoglu residence. That Defendant's experts disagreed with Plaintiff's experts as to the source of the fire or underlying facts related to which appliance the wires were collected from, does not demonstrate the verdict was against the clear weight of the evidence. Instead, a reasonable jury, after reviewing all of the evidence, and crediting Plaintiff's expert's testimony could conclude a design or manufacturing defect in the Mr. Coffee coffee maker was the source of the Camoglu fire.

1    Finally, Defendant submitted supplemental authority a few days preceding oral

2    argument, raising a new argument that the general verdict in this case is not sustainable

3    because the negligent design claim was permitted to go to the jury.  As this argument was

4    raised for the first time after briefing was complete, and days before oral argument, the Court

5    did not consider it.  Holman v. Indiana, 211 F.3d 399, 406 (7th Cir.2000) (finding appellants

6    who advanced a legal theory at oral argument that they had never before raised in their briefs

7    on appeal had waived that new argument).

8               **3.      Evidentiary Rulings**

9        Next, Defendant asserts a new trial is warranted because the Court erred in: permitting

10   Captain Zimmerman to testify; permitting Mr. Lindsey to testify; and excluding Dr. Zamiski's

11   burn test.

12               **a.      Captain Zimmerman**

13       Defendant argues Captain Zimmerman's testimony exceeded the scope of the Court's

14   motion in limine ruling and, in the alternative, his testimony was inadmissible under Daubert.

15   Plaintiff proffered Capt. Zimmerman as one of two cause and origin experts.  Defendant

16   moved in limine to preclude Capt. Zimmerman's testimony. Dkt. #136. At a Daubert hearing

17   held on March 1, 2004, the Court found Capt. Zimmerman's testimony was inadmissible

18   under Rule 702 because Capt. Zimmerman did not investigate or test the coffee maker power

19   cord, the toaster power cord,  the coffee maker's safety devices, or the flourescent light, and

20   therefore, Capt. Zimmerman's opinion's were not based upon sufficient facts or data.

21   Secondly, the Court found when making his conclusions Capt. Zimmerman did not conform

22   to the generally accepted standards for fire investigation in the community because he did

23   not investigate or test the coffee maker power cord, the toaster power cord,  the coffee maker

24   safety devices, or the flourescent light.  Accordingly, the Court precluded Capt. Zimmerman

25   from testifying as an expert, but permitted his testimony as to his personal observations.

26       Under Rule 701 lay opinion testimony is admissible if "the witness' testimony in the

27   form of opinions or inferences is limited to those opinions or inferences which are (a)

28   rationally based on the perception of the witness, (b) helpful to a clear understanding of the

witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. Rule 701.

First, the Court notes there was no contemporaneous objection to Capt. Zimmerman's background testimony regarding V-patterns.  Further, the Court finds this testimony was not to the cause and origin, and instead, related to Capt. Zimmerman's knowledge of how burn patterns are relevant to a fire.  Furthermore, Capt. Zimmerman testified as to his personal observations, which included where V patterns pointed, but not as to his opinion.  Here, Capt. Zimmerman stated "[a]t the base of the V pattern in this area here, located at the bottom portion here, was the remains of the coffee maker." Tr. 3/3/05, p.117.  The Court finds this testimony did not exceed the scope of the Court's Daubert ruling and was permissible.

### b.    Mr. Lindsey

Next, Defendant asserts Mr. Lindsey's testimony should have been precluded because it was based on an unreliable methodology.  Specifically, Defendant argues Mr. Lindsey did not comply with National Fire Protection Association ("NFPA") guideline 921 because he did not test his theory that possible inadequate soldering on the circuit board and possible defective wiring were the cause of the fire.  While major portions of the coffee maker were consumed in the fire, Defendant argues Mr. Lindsey failed to comply with NFPA 921 because he did not test his theories.

Defendant failed to argue in its motion in limine or during the Daubert hearing, that Mr. Lindsey failed to test his theory.  Additionally, Defendant never cross-examined Mr. Lindsey regarding whether he tested his theories. Instead, Defendant argued Mr. Lindsey's testimony was unreliable because he failed to rule out all other possible ignition sources, because the fire destroyed substantial portions of the coffee maker, and was primarily premised on missing materials. The Court cannot now assess whether Mr. Lindsey did or did not test his theories and what effect, if any, they would have on the admissibility of Mr. Lindsey's testimony. As the first mention of this argument was in its motion for a new trial, the Court concludes Defendant has waived this argument.  See Palmerin v. City of

Riverside,794 F.2d 1409, 1413 (9th Cir. 1986) (holding litigant preserves an issue on appeal "where substance of the objection has been thoroughly explored during the hearing on the motion in limine.")

### c. Precluding Evidence Regarding Dr. Zaminski's Burn Test

Finally, Defendant's argue the Court erred in precluding evidence regarding Dr. Zaminski's burn test.  The Court granted Plaintiff's motion in limine to strike portions of the report of Gerald F. Zamiski, finding the burn test was a reenactment of the Camoglou fire and was not substantially similar.  Dkt. ##142, 158.  A motion for new trial is not the time to ask the Court to rethink what it has already thought.  United States v. Rezzonico, 32 F. Supp. 2d 1112, 1116 (D. Ariz. 1998).

Defendant contends that Dr. Zamiski's burn test was not meant to recreate the fire, but merely to support his underlying theory of the fire. However, Dr. Zamiski took an identical coffee maker on a Corian counter and placed a heating unit as near as possible to where Plaintiff's experts alleged the location of the ignition source.  "Substantial similarity depends upon the underlying theory of the case." Four Corners Helicopters, Inc. v. Turbomeca, 979 F.2d 1434, 1440 (10th Cir.1992).  "[E]xperimental evidence falls on a spectrum and the foundational standard for its admissibility is determined by whether the evidence is closer to simulating the accident or to demonstrating abstract scientific principles." McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1402 (8th Cir.1994).

Despite Defendant's assertions the burn test did not recreate the fire but only was relevant to principles of causation and to support Dr. Zamiski's underlying theories, experimental tests which appear to recreate a fire have been excluded if they are not substantially similar. Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1060 (8th Cir. 2005) (concluding in a products liability action against manufacturer of a copier which allegedly caused a fire damaging a strip mall, trial court did not abuse its discretion in excluding experts' opinions regarding the fire's origin on basis that underlying experimental testing would be confusing to the jury; experimental tests appeared to recreate the cause of the fire while failing to address the presumed malfunction of the heater control

circuitry and its associated safety features); Four Corners Helicopters, Inc. v. Turbomeca, 979 F.2d 1434, 1440 (10th Cir.1992) (excluding evidence attempting to recreate a helicopter crash where the plaintiff alleged a loose screw caused the crash because the experiment was not substantially similar; experiment used a high-torque device while the helicopter engine was low-torque; experiment operated at 1000 RPMs, while the engine functioned at 35,500 RPMs; and in the lathe experiment, 100% of the torque was applied to the screw, while in the engine only a small percentage of torque handled the resistance of the screw).

In the instant case, Dr. Zamiski conducted a test on an identical Mr. Coffee, placed on a Corian counter top, and added a heat source as close as possible to the location identified by Plaintiff's expert.  Further, the Court found, that the circumstances of the burn test did not satisfy the substantially similar test because, in pertinent part, differences in the heat applied to the coffee maker, the amount of water in the coffee pot, thickness of the Corian counter top, etc.  Accordingly, the Court properly excluded evidence of the burn test because it was not substantially similar to the Camoglo fire and under Rule 403 the probative value was significantly outweighed by the risk of unfair prejudice.

## IV.    Motion for Remittitur

### A.    Legal Standard

Under Rule 59(a), this Court may grant a motion for a remittitur if the jury award was against the weight of the evidence.  See Byrd v. Blue Ridge Rural Elec. Coop., Inc., 356 U.S. 525, 540 (1958); FED. R. CIV. PRO. 59(a) (2005).

### B.    Contents

In its motion for a remittitur on the jury award of $833,000 for the reasonable value of the contents, Defendant again argues there was insufficient evidence for the jury award because Mr. Olsen: did not view the contents, did not view photographs of the contents, was based on hearsay conversations with Mr. Soloman, based on the Camoglus' representation of their losses, and was not depreciated based on industry standards.  As stated above, the Court finds, Mr. Olson's testimony was reliable and sufficient to support the jury award because Mr. Olson relied on a Vigilant employee, who personally viewed the contents,

viewed pictures of the damaged areas, has extensive experience adjusting high-end claims, and interviewed the Camoglus.  Further, the Court finds the sampling and negotiation method of assessing fair market value is an acceptable practice in the industry when valuing contents after a fire.  Accordingly, Defendant's motion for a remittitur on the reasonable value of personal property is denied.

### C. Reasonable Value of Necessary Repairs

Defendant argues a remittitur is warranted because contractor John Hanks testified insurance money was used to pay for improvements which were unrelated to the fire, including a new room, gas lines, gas appliance, granite counter tops, a remodeled laundry room and master bath, garage doors, pool tiling and decking, new landscaping, and exterior masonry walls.  The evidence established Mrs. Camoglu paid only $10,000 separately for these improvments, which Defendant argues a reasonable jury would have concluded cost more.

However, there has been no evidence the award exceeded the actual cost of restoration.  The Court finds a reasonable jury could have concluded improvements unrelated to the fire were simply substitutions for items, which were damaged by the fire, i.e. instead of replacing the Corian counter top, Ms. Camoglu chose a granite counter top.  Accordingly, Defendant's motion for a remittitur on the reasonable value of necessary repairs is denied.

### V. Plaintiff's Motion to Amend the Judgment to Comport with the Verdict and to Include Prejudgment Interest

In its motion to amend the judgment, Plaintiff argues the judgment should be revised to incorporate prejudgment interest pursuant to the liquidated damages as of April 8, 2003, the date Plaintiff provided Defendant an itemized documentation regarding payment for the contents and restoration of the Camoglu residence.  Defendant argues Plaintiff's claim was not liquidated on April 8, 2003, because the damages were based on opinion or discretion.

Under Arizona law, liquidated claims are entitled to prejudgment interest.  Ariz, Title Ins, and Trust Co. v. O'Malley Lumbar Co., 484 P.2d 639, 649 (Ariz. 1971).  An award of

prejudgment interest on a liquidated claim is a matter of right rather than discretion. <u>Aries v. Palmer Johnson, Inc.</u>, 735 P.2d 1373, 1384 (Ariz. Ct. App.1987). A claim is "liquidated" when "it is subject to mathematical computation without reliance upon opinion or discretion." <u>Id.</u>  1 Dan B. Dobbs, Law of Remedies § 3.6(1), at 337 (2d ed. 1993) (prejudgment interest permitted if damages "can be ascertained by application of arithmetic or by the application of 'accepted standards of valuation,' without reliance on opinion or discretion.").

In the instant case, the contents claim was far from certain and instead was based, as discussed above, almost entirely on Mr. Olson's opinion, without reference to original receipts, minimal estimates, and minimal replacement receipts.  The cost was based on sampling and negotiation.  The concept of negotiation necessarily implies discretion and Mr. Olson testified to his reliance on the Camoglus and fact that they were proceeding in good faith as a factor when he was negotiating.  Accordingly, the Court concludes the contents claim was based on "opinion and discretion" and was not liquidated until the return of the jury's verdict.

Secondly, ascertaining construction repairs necessarily involves opinion and discretion. <u>Custom Roofing Co., Inc. v. Alling</u>, 706 P.2d 400, 403 (Ariz. Ct. App. 1985).

> What the profit will be on a construction contract, it seems to us, is necessarily a matter of opinion. Materials to be utilized can be computed with exactness; labor, however, is much less precise and is, at best, an estimate. Such estimates will sustain an award for damages but they do not reach the level of exactitude required for an award of prejudgment interest.

<u>Id.</u>

Liquidated damages include those capable of ascertainment and calculation.  In <u>Ry-Tan Const., Inc.  v. Wash. Elem. Sch. Dist. Numner 6</u>, 93 P.3d 1095, 1120-1121 (Ariz. Ct. App.) *rev'd on alt. grounds* 111 P.3d 1019 (Ariz. 2005).  The Arizona Court of Appeals concluded Plaintiff's lost profits were not liquidated until the parties stipulated to an exact amount, because Plaintiff failed to identify data, itemize profits,  or a method for calculating its lost profits, commenting "the fact that both Ry-Tan and the School District continued to dispute the amount of damages until the stipulation at trial, and were prepared to present

expert testimony regarding calculation of the amount of lost profits, belies Ry-Tan's argument that the amount was previously liquidated." In <u>Marvin Johnson, P.C. v, Shoen</u>, 888 F. Supp. 1009, 1017 (1995) plaintiffs sought prejudgment interest on a quantum meruit claim for attorneys fees.  Finding the damages were not liquidated the Court reasoned, the amount of the bill was purely discretionary, the bill was not accompanied with records of the hours spent on representation, and "[t]he plaintiffs were seeking the "reasonable value" of their services. By its very nature, that phrase implies an unliquidated claim." <u>Id.</u> In contrast, the Arizona Court of Appeals found repair costs to a super market from a fire were liquidated. However, the Court of Appeals did not address the type of damages or evidence provided and simply stated the record establishes "repair costs and architect fees were ascertainable." <u>Alta Vista Plaza, Ltd. v. Insulation Specialists Co</u>, 919 P.2d 176, 177 (Ariz. Ct. App. 1995).

In the instant case, Plaintiff provided Defendant lists of checks given to the Camoglus and total sums of the contents claim at $895,833, the building claim at $1,310,725, and additional living expenses at $121,960.  Plaintiff did not itemize payments, costs, labor, or materials.  Plaintiff presented lay testimony from contractor Jack Hanks regarding the cost of repairs.  Although not presented at trial, Defendant relied on expert testimony of Mike Keith and Diane Gordon to ascertain the repair cost to the Camoglu residence.  Accordingly, based on the inexact nature of estimating labor, the testimony required to establish the cost of repairs, and the inability to ascertain these calculations in any precise matter, the Court finds damages were not liquidated prejudgment.

**Accordingly,**

**IT IS HEREBY ORDERED** Plaintiff Vigilant Insurance Company's Motion to Alter Judgment is **DENIED**. (Dkt #229)

**IT IS FURTHER ORDERED** Defendant Sunbeam Corporation's Motion for New Trial or a Remittitur is **DENIED**. (Dkt #236).

1      **IT IS FURTHER ORDERED** Defendant Sunbeam Corporation's Renewed Motion

2   for Judgment as a Matter of Law is **DENIED**. (Dkt. #246).

3      DATED this 17th day of November, 2005.

<br>

Mary H. Murguia
United States District Judge